Page 123-1054, et al. New Jersey Conservation Foundation, et al. The petitioner, v. Federal Energy Regulatory Commission. Ms. May Smith, for the petitioner. Mr. Thorpe, for the intervener. Ms. Berry, for the respondent. Ms. Whitmer, for the intervener. Good morning, Ms. May Smith. You can proceed when you're ready. Thank you, Your Honor. May it please the Court, Monique May Smith with Earthjustice on behalf of all the petitioners. The project at issue here is a massive expansion of the gas system. Approved to primarily serve the alleged need of New Jersey distribution company customers. A need that the New Jersey Board of Public Utilities found does not exist. FERC's reasons for adopting essentially the contrary conclusion rests on its over-reliance on precedent agreements and its wholesale acceptance of the finding of a study that FERC itself admits contains methodological deficiencies. FERC's handling of the evidence here was arbitrary and capricious, and its claims that the project is needed and provides benefits are speculative, not supported by the historical practices of the distribution companies, and not supported by the record before FERC. The project further would cause substantial harm that FERC has not accounted for, including the potential to pass huge costs of year-round capacity onto captive rate payers and producing more than 16 million tons per year of greenhouse gas emissions, which on day one would be almost 12% of New Jersey's entire state inventory, and by 2050 would be almost 50% of that inventory. Fail FERC to assess the significance of or weigh those harms, including how the project will prevent New Jersey from meeting statutory mandates to reduce emissions. The sheer size of the harms here should have meant that every part of FERC's decision got more scrutiny, and yet FERC did the opposite. It inflated and manufactured the project's needs and benefits, and it minimized and ignored its harms in violation of both the Natural Gas Act and NEPA. What do you make of the several decisions of this court that have held that precedent agreements subscribing to 100% of the pipeline's capacity may be sufficient to show market need? And here we have more. We have statements by suppliers. We have these studies. Yes, Your Honor. So it may be sufficient to show market need, and especially pointing to this court's decision in EDF v. FERC, that the commission has to look at the totality of the record in front of it and consider all relevant factors, which is what the court here in the EDF decision emphasized, as well as what is in FERC's own policy statement. And here, Your Honor, yes, there are studies on the one hand by Transco, which is the applicant and has a vested interest in getting its project approved, but then on the other you have a finding by the board, not just a study, but a finding by the Board of Public Utilities of New Jersey that was done after a full public proceeding in which these shipping companies had an opportunity to participate. The board took all of the evidence in front of it and commissioned an independent study and came to the opposite conclusion that there was not only is there not all of this capacity needed, none of this capacity is needed. So I guess I want to further explore how that seems to be in tension with the notion that precedent agreements can show market need. I mean, I understand and we have said in prior cases that a showing of market need is important to ensure that current rate payers don't have to bear the burden. And so we've treated, we've looked for the market need being met by new customers, but then if the precedent agreements are by existing LDCs, that doesn't seem to show new demand. It's basically taking current captive customers and assuming that they will be paying the price. So I'm really asking you to help me understand our court's own precedent, some of which I wrote, but just sort of how do you deal with that precedent, which is binding on this court? Yes, Your Honor. Well, I would, again, point to the fact that there has been, I think, some shift in that precedent in the EDF v. FERC context where the court recognized that the reason that we typically and this court has typically looked at precedent agreements as evidence of market need is because we assume that that's actually what these agreements showed. In the EDF case, however, the court looked at the totality of the circumstances and found, wait a minute, there might be something else going on here. These agreements may not, in fact, show us what we have assumed them to be evidence of in the past. Is that the Spire case? That's the Spire case, yes, Your Honor. Right. So is there any other case where we've discounted precedent agreements? Because it sure seems to me that, although I appreciate the point, that case is very distinguishable. There was an open season with no takers at all, and then they came up magically with a precedent agreement to an affiliated company. Here, 82% of these precedent agreements are unaffiliated companies, so it seems like the logic, at least what we explained there, wouldn't apply here. So, Your Honor, there are some differences in fact, but the logic still does apply because the concern the court had was, are captive ratepayers being made to pay for capacities that they don't actually need? And while the reason for that in the Spire case was the nature of the affiliated relationship between the pipeline company and the shipper, here there is that possibility just as much because you have the potential for these shippers, these LDCs, to not actually have to pay for the capacity they're contracting for. And where you have a study by the board, which is the statutory, the entity that is statutorily responsible for ensuring adequacy of supply in New Jersey, saying these captive ratepayers don't need this gas. The commission has to stop and say, are these precedent agreements truly evidence of a real need, or is there a potential for the cost of that capacity to get passed on to captive ratepayers? So wouldn't that argument mean, and maybe this is similar to Judge Pillard's question, that precedent agreements never mean anything? No, Your Honor. In this context, it's always going to be a shipper with some other customer at the end of the line. Not necessarily, Your Honor. There are different kinds of shippers. There are some shippers, for example, Williams in this case, that are not LDCs. They are merchant companies, and so those companies are, in fact, incurring the risk of buying a bunch of capacity and not having any takers. The nature of the relationship here is different because you do have those captive ratepayers at the end of the line that might end up, and very likely could end up, footing the bill for capacity that the state is saying isn't necessary. And the nature of that is that the LDCs, for whatever capacity they don't need and that isn't used by those ratepayers, they can turn around and sell it and then profit from that. And the profit goes, in large part, to the shareholders. It doesn't necessarily go back to make those ratepayers whole for having paid for capacity that's unnecessary. Although if I take it, the Transco's and FERC say, well, there's market logic. Why would anybody invest in something that's going to create an oversupply? I mean, Williams is a check on that because it can't pass those costs along to existing captive ratepayers, and so why would it see this as a good investment if it didn't think that over the life of its contract that there is going to be a need supporting high prices for the shipping? Well, and that, Your Honor, I think conflates what market you're talking about and who is picking up the tab for that capacity. There's a difference between is there a need by these captive ratepayers, which is what FERC is claiming exists here, but what New Jersey has said does not exist. And then on the other hand, are there some other set of actors, including intermittent customers out in the natural gas market that would be capable and willing of buying this capacity? So there might be a broader market demand or possibility to sell this gas, but that's a different question than who's picking up the tab and who is not just picking up the tab, forced to pick up the tab. And because FERC's responsibilities very clearly include protecting ratepayers, that was part of the reason why. But do you have specific evidence this is going to result in higher prices for ratepayers? Because I might be misunderstanding, and this is why I'm asking, but I thought your reply brief actually says that what you think these LDCs are going to do with the excess supply is try to offload them at below market prices, which doesn't seem like a big problem for ratepayers. But the ratepayers are paying for the capacity, so they're already paying for the price of the project itself, the almost billion dollars that it takes to construct this project. They're paying for the capacity. That gets baked into their rates that they pay on the regular. Then there's the question of, well, if the LDCs don't need all of that capacity, can they turn around and resell that out into the market? And because they have someone paying for the expense of the project, they can offer it at lower rates for the reason that their ratepayers are the ones paying for the cost of that capacity, and the LDC itself doesn't have to incur that. I have two follow-up questions on that. Presumably, if your criticism is valid, then this problem would be endemic. Are there any cases that have dealt with it? Your Honor, this is really the first time that this robust record has been presented to FERC and that this clear finding has been presented to FERC by a state that undertook a full study of its own to determine does this area need more gas. So there is no other precedent to point to, unfortunately. This is sort of a first-of-its-kind moment where this level of conflicting evidence was presented to FERC, and FERC decided to essentially ignore it and side with TRANSCO's version of events and authorize the entirety of the capacity for this project. I want you to be able to finish your point. No, I was just going to say I'm seeing that I'm out of time, and there wasn't a whole other chunk that I was going to get to. We in this Court have a very rigorous timekeeping practice, which is that as long as we have questions, we deem your time to be remaining. So the second question, as I mentioned following up on that, is that FERC mentions that sometimes retail regulators will require the sharing of revenues from off-system retails of capacity with captive customers who pay for the underlying assets. Is that the case in New Jersey and any other states that will be receiving this? And if not, is that a way that the state could respond? I believe, Your Honor, that what FERC raised was more a function of whether or not the state could make a finding of imprudence and prevent the cost of the project from being passed along to the rate payers. I don't know, to be honest, Your Honor, the direct response to your question, and that might be something that Rate Counsel might be able to help you out on. But with respect to the imprudence finding, that's a very rare occurrence that states will make that finding, in no small part because it is a deeply imperfect remedy. It puts the LDC in a not fabulous financial position, which ultimately is something that affects rate payers' rates for a whole host of reasons. The other reason why that would not actually be, and also FERC doesn't know that either of those things would, in fact, happen. It's speculating. And so it needed to at least consider, and it refused to do that here, the possibility that the cost of this project will get passed to rate payers who are captive, and to seriously consider whether that's wise in the face of New Jersey's findings. I know you have a whole other, yeah, I've got other questions. Okay. I'll jump in here now. One of the biggest concerns that you all seem to present is that there was never an evidentiary hearing. So I would like to know what you feel that that would reveal. I mean, it is a billion-dollar or more project. And so what do you feel like that would reveal? Because this whole thing was dealt with essentially on the paper. Yes, Your Honor. There's a long list of things that we would want to investigate in an evidentiary hearing. Among other points, it would be that one of the crux discrepancies in this case is the belief and the fear that off-stream peaking contracts that LDCs have relied upon for years continue to rely upon to meet peak needs. So rather than contract for, as these precedent agreements would have it happen, all of the gas that you would need in January 365 days out of the year, what LDCs have historically done is to enter into shorter-term one- to two-year contracts to meet peak seasonal needs. Transco's study assumes that these companies can no longer do that. And FERC essentially says, well, that might happen. So we're going to go with Transco. Whereas the New Jersey finding and the other pieces of evidence in the record very clearly said that's been happening for years. There's no reason to suspect that that's suddenly going to disappear. So we're counting on the availability of that. This issue, one difficulty we have is it's not an issue FERC didn't address. They do say that the key difference is the assumptions about non-firm supply, and these are short-term contracts, and our job at FERC is to plan against true worst-case scenarios. And we can't say with any confidence that these contracts are going to be available ten years from now. So what we're going to do is credit the study that takes the most conservative approach. And I certainly think the other approach is probably reasonable too, but I'm not sure how we can say FERC's approach is unreasonable. You can say that FERC's approach is unreasonable, Your Honor, and this will also respond to Judge Howe's question about what we want to investigate, because FERC didn't substantiate that that risk exists. They didn't explain why they think it's better to be more conservative or what actual fear there is that these contracts will suddenly go from providing hundreds of thousands of decatherms to no longer being available at all. Well, they did say that the demand elsewhere might change, might increase. They did point to the fact that there's a legal difference between firm contracts and the availability on a, you know, I don't know if they call them spot markets here, the way they do on electricity, but, you know, the availability in a peaking situation. Presumably in that situation, everybody is going to want the same capacity. So they gave some, what I would think of as sort of basic economic logic, and then New Jersey turns around and says, you know, 20 years of experience. And so I guess the question is, you know, we defer to the expert agency, and short of making some kind of de novo determination ourselves, which is beyond our scope of our review, how do we manage that? You manage it, Your Honor, and just to clarify, this is not, unlike a spot market, this is not a day-to-day thing. So this is not a question of availability on the absolute coldest day of the year, and then LDCs run short. LDCs are legally required to have contracts in place to meet design day. So the kinds of things we're talking about here are one- to two-year contracts that are entered into, and once you enter into those contracts, you have as much right to that gas as if you were under a 365-day-a-year contract. And so the reason that this is not a de novo review, but it's simply looking at the sufficiency of the record question, is, again, FERC never substantiated or explained, other than to say, well, maybe it will be cold, or maybe this could happen. They never actually explained why they think it's going to happen, especially in light of the evidence that was presented to them by the State of New Jersey that this gas is there, that it's unlikely to go anywhere. And, in fact, in terms of what's in the record as well, the downstream states that the gas might flow to, for example, New York, all have aggressive climate reduction requirements. So the likelihood that the gas that is flowing through New Jersey and into other downstream markets would suddenly become completely unavailable for purposes of these one- to two-year seasonal contracts is just not supported by the record, and it's not good enough for FERC to say, well, this might happen. So to go back to your question, Judge Childs, about what we would want to see in an evidentiary proceeding, it would be a building out of the record on that particular point, on where does this risk come from, how big is this risk. And I would additionally indicate the issues with respect to climate change. I mean, who are we to look to in that regard? You've got the Council on Environmental Quality, they're charged with administering NEPA, but then you also have EPA charged with controlling air pollution, and there does not seem to be FERC really evaluating the climate change, although there has been precedent allowing them to at least lean in on that. And so I would ask you that. But then also we have cases like Delaware Riverkeeper, where the court has deferred to FERC's discretionary decision-making with respect to downstream GHG emissions. So to transition over to the question of how FERC assesses climate and the problem really is that FERC failed to grapple with the significance of the project's climate emissions. And NEPA requires that the agencies conducting an EIS explain to the public and disclose to its own decision-makers whether and to what extent the harms that they are quantifying matter. What FERC did here is a little like having them declare that there are going to be hundreds of animals killed, threatened animals killed, as a result of the project. Do the math and then stop. And not explain, does that matter? What is the effect of that harm that this project is causing? Just to interject, and I don't want you to lose your point. So is it your understanding of the record that the commission effectively set the greenhouse gas, made all the calculations and the social cost determination, and then set it to one side and, in fact, didn't include it in its balancing of harm? Yes, Your Honor. And so it very much, that failure to make a significance finding, very much affects the determination under the Natural Gas Act. Significance is discussed a great deal in the case, but forgive me. I know significance is a trigger for whether an environmental assessment or an EIS is done, but here an EIS is done. Is significance also the threshold for whether something has to be given any consideration at all? I mean, what is sort of the operative, why does it matter whether the amounts that were calculated or were labeled significant? Because if they're in the record, is it not an obligation of the agency that's taking the subject action to consider them? I mean, I think, Your Honor, first of all, they didn't consider them. I heard you on that. Yes. But the follow-up question is, what role does significance label in your challenge? So the role of the significance label, Your Honor, is not just a label. It is, does the agency actually discuss how bad this harm is? What does this harm mean? What does this number mean? And that has a really important purpose under NEPA as well as we've already mentioned under the Natural Gas Act, which is that it is supposed to, if you find an effect to be significant, the agency is supposed to compare alternatives according to that and compare the relative effects of alternatives according to that harm, as well as consider mitigation measures. Because the idea is, if something is significant, can you mitigate it down below a level of significance and then ultimately have what is known as a mitigated, a finding of you have no significant impact because of those mitigation measures? By putting a pin in this discussion, FERC did none of those things. So that's within the context of what NEPA requires. There is also under the, I mean, the ultimate determination that the Commission made that you're challenging is the certificate order. And under the Natural Gas Act itself, there's a requirement of balancing. And I guess my question is, even if for the purposes of NEPA, for the purposes of alternatives, of mitigation, significance is a trigger, there is nonetheless a set of numerical valuations in the record. And what is your position on whether under the Natural Gas Act, significance or no, the Commission has an obligation to include in its public interest weighing the identified and estimated greenhouse gas and other effects? It absolutely does, Your Honor, and that's exactly why FERC's approach here is a problem. Because whatever numbers it came up with in the FEIS, it did so and labeled them itself for informational purposes only. And so those numbers never made it into FERC's balancing of harms versus benefits in its determination under the Natural Gas Act. The orders say nothing about, well, wait, what does this mean for these emissions to constitute 50% of New Jersey's emissions by 2050? What does this mean for a state that is trying to aggressively reduce, under its own law, greenhouse gas emissions? There's none of that. And I would say, too, the failure of the discussion under NEPA of comparing alternatives based on their climate effects as well as contemplating mitigation measures to address climate change. NEPA is an informational statute and it's supposed to inform the substantive decision. When there's no discussion of those things in the NEPA document, then that inevitably renders the substantive decision under the Natural Gas Act incomplete and defective. Although I guess I'm still a little bit confused when you say there's no substantive discussion. There's actually quite a bit of substantive discussion. But when you say for informational purposes only, I think there may be two understandings of what informational purposes are. NEPA is an information-enforcing statute with the assumption that there's a wide range of ways that that information can bear on a decision. And in a statute like this one, which has a very open-ended requirement of balancing, it seems like information is all that NEPA needs to ensure and then the agency has to act on that. So the informational purposes only seems like a chameleon-like phrase saying we can treat it as mere information. We don't actually need to include it in our balancing. And that's your understanding of what they have done? Yes, Your Honor. Go ahead. They did not factor climate. To label it information only meant that they did the math and did nothing more with that math for purposes of understanding how the harms of this project balance out compared to the benefits. Well, there's certainly a lot. I'm sorry. Go ahead. Just to follow up on that. Even if we found a market need, you're still saying that the harm outweighs any benefit and that we need to get to that step two. Yes, Your Honor. And we would say that FERC hasn't established that the benefits outweigh the harms because they ignored such a huge harm here in the form of ignoring the project's climate change impacts. But your ultimate remedy, your request is grant the petition, vacate the orders, and then remand to do what? Okay, but this was done on paper. So is it further that an evidentiary hearing would be required to get to that appropriate balancing? Because personally, if you remand something, even with that instruction, you can just better write it up to get to your result. Yes, Your Honor. The problem here is that FERC didn't really engage in that balancing act at all, so it's difficult to think about how from this part of the errors that FERC committed would be subject to an evidentiary hearing to the extent that FERC felt like it needed more information in order to accomplish that task. So you're not asking for an evidentiary hearing, just the rebalancing? For the purposes of the climate argument, yes, Your Honor. For the purposes of the need argument and the assessment of benefits as well, which does feed into the balancing, an evidentiary hearing is certainly something that would be welcome to be able to really dig into some of the problems with the record and questions that FERC just never asked. And I've listed a few, but we also go into some more detail in our brief about, you know, the assumption made Commissioner Clements notes that there was an assumption made about the fact that one of the LDCs didn't have any short-term contracts on its books, but FERC never asked why. It just assumed that the reason was because those contracts were unavailable. To probe elements of the record along that line, an evidentiary hearing would certainly be a useful tool in those areas. Yes, so a few questions. The first one is just a technical one. I think I understood you earlier to be acknowledging, just for purposes of NEPA, that where you have an emission that has insignificant impacts, there's no duty triggered to consider mitigation possibilities, right? So the significance determination is the trigger for that. Yes, Your Honor. Okay. Then, so this is a little bit difficult to do, but the certificate order does have several paragraphs, 69 to 73, that set out the greenhouse gas information, right? And it declines to make a significance determination. And then in the conclusion on J584, it refers back to all of the environmental information that we've set forth, essentially, and says we find the need outweighs the impact. I just expect FERC will get up and say, that's how you know we considered all of the greenhouse gas emissions and nonetheless found it, this project, to be justified. And I just, what's your response to that? We needed more of a paragraph that said, even though it's 11.8% of New Jersey, that's warranted for X, Y, Z reasons. Yes, Your Honor. And to the extent that FERC is effectively, by failing to do a significance determination, treating the emissions as if they don't exist, that is not an appropriate approach under NEPA, especially when you're dealing with a project that has emissions of this magnitude. To the extent that they are claiming that they weighed those harms, again, given the extent, if we were talking about a project, and they've done this before, they've had projects with very small levels of greenhouse gas emissions, and they've said, well, we may not have a threshold, but we know that this is insignificant. So they've done that. They've shown themselves capable of doing that. This project is sort of the other side of that extreme of having millions of tons per year. It defies logic a little bit to think that they could just not address that at all in a more detailed way to discuss, again, how is that harm not sufficient to really outweigh the other benefits that they've identified? And I just had one last. Or at least not sufficient enough to, wherever the line is drawn, I'm trying to understand if this is your argument, wherever the line may be drawn by the Council on Environmental Quality or some competent policymaker on this question, you're saying, well, where this is not a closed case, the commission should have assumed, well, this is, whatever significance is, this is significant, therefore let's look at mitigation measures, and therefore let's weigh. And I'm not sure significance matters in terms of the weighing under the Natural Gas Act, but we'll hear from other council on that. But is that, in effect, your position? Yes. I mean, certainly you're honored to admit that these, again, if you want to use the significance label under the Natural Gas Act or not, but these are a big deal. These are a lot of harms. Can we mitigate them? Let's consider mitigation measures, which, and the only line for exclusion documents here is, well, Transco didn't propose any, so that's it. But let's actually look at can we get these numbers lower, and if we can't. Whose burden is that? The burden is on the commission, Your Honor, to ensure that it complies with both NEPA and the Natural Gas Act that contemplates imposing conditions in order to. But in a case like this, is it not the petitioner's burden to say there are mitigation measures that were overlooked? I think, Your Honor, it's certainly the applicant's burden to present them, but in the absence of those being presented, it is FERC's burden to reject the project if it doesn't have sufficient evidence to make a determination, again, that complies with a statutory standard that says, unless this project is required by the public convenience necessity, you can't approve. So if FERC is sitting there with an incomplete record and has these huge harms in front of it in the form of these greenhouse gas emissions and no one has proposed any mitigation measures, then FERC can either say, well, we don't have the basis in front of us to find affirmatively that this project is required, or, as FERC does in many instances while these documents are being considered, go back to the applicant and say, we'd like some more information. How about some mitigation measures? One last very specific question. We were discussing earlier, I appreciate the very good point that one thing we might do is, on the TRANSCO study and this debate about whether to include non-firm supply, that they haven't supported this judgment that there's a risk these contracts won't be available in the future. I think the one specific piece of evidence they pointed to was that one of the LDCs, New Jersey Natural Gas, predicts that these resources will become unavailable in the next few years. Is that a misunderstanding? That's what it says in paragraph 65 of the hearing order. So is that incorrect? The predictive nature of what the record actually shows is the only thing that I would quibble with, Your Honor, there on that. It's not that New Jersey, it's not that there was an affirmative statement that says, we can't get these contracts anymore because they are unavailable. The piece of evidence that actually exists in the record is just, they're not going to. They're not signing up for that capacity in the nearer term, in 2020, after 2022. There isn't, so to assume that that means, the reason for that is, again, this was Commissioner Clement's point in her concurrence, to assume that that's because they can't, as opposed to they are going to figure out another way. The point would be if they need it in the future, they can do it, and this is inconsistent with that. Correct. Okay, thank you. Correct, Your Honor. I am well over time. I appreciate this, Your Honor. We will give you some rebuttal time. Thank you. Thank you. Good morning. Thank you. May it please the Court, Jeffrey Schwartz from the New Jersey Division of Rate Counsel. Picking up with one of Judge Garcia's questions, yes, FERC, at the end of its order, states that this project is environmentally acceptable, but stating a conclusion is not enough for judicial review or the APA. The agency needs to explain its reasons. It fundamentally did not do that. Judge Pillard, you're correct. The Natural Gas Act requires FERC to make a public interest determination. That means it must decide whether the project's harms or benefits are more substantial and give reasons why. Here, it did not do that. FERC here approves. You're arguing, so there are some, there's a range of quantification of the costs, for example, of the greenhouse gases. There's no quantification on the beneficial effects, the cost savings to rate payers. Have you argued that that's inadequate because it's price information and there should at least be some effort to estimate the extent to which this will save money to rate payers? Absolutely. That's one component, and you were correct. We have argued that FERC makes vague references to reliability, supply diversity, and cost benefits, which are basically the same kind of Ipsy-Dixon assertions that this Court found insufficient in the Spire case, Environmental Defense Fund v. FERC. But moreover, if you go and look in the record, what you'll find is that those benefits are quite meager. According to TRANSCO itself, the project will leave pipeline constraints on just four days a year. That's a JA-166, and will reduce annual prices by less than one-half of one percent. That's JA-168. And TRANSCO emphasizes that even those estimates are highly uncertain, JA-175. Are there other processes for these increased costs to rate payers in the sense of a separate proceeding or an after-the-fact prudence review? So New Jersey can partially deal with some of the rate payer harm. FERC clarified that New Jersey can conduct an after-the-fact prudence investigation. That only fixes part of the problem. New Jersey can disallow the pass-through to rate payers of pipeline construction costs, but doing that presumably means that the distributor companies are going to eat those costs. That makes them riskier investments in the eyes of Wall Street. It increases their financing costs, their costs of debt. That increased cost gets applied to the utility's whole rate base, and ends up increasing rate payer costs in other ways. So it's a very imperfect solution from a rate payer and public regulator standpoint. And, of course, it does nothing at all to address the project's climate change impacts and its hindrance of New Jersey state policy to reduce emissions. I found the argumentation and the record a little bit complex on interruptible demand. Does the certificate rely on interruptible demand? And if not, is it problematic that the Transco study does? And is it problematic that the commission in discrediting the New Jersey Council study points to its failure to consider potential interruptible demand by electricity generators that would be relying on natural gas? FERC treated the possibility of electric generator demand as a bit of a magic wand or get-out-of-jail-free card, that it could wave over the question of need and fill the gaps in the reliability analysis. But remember, this project was justified primarily on the basis of a reliability need of the New Jersey distributor companies. Without their 56% subscription, this project is only 44% subscribed, and if you take out Transco's affiliate, that percentage drops to 26%. If you take out the Maryland LDC, which accounts for 5%, and, of course, Maryland joined the state advocates' brief urging this court to vacate FERC's order, you get down to the order of, like, 20%. Trying to justify this billion-dollar project that will massively spike greenhouse gas emissions contrary to state policy on the basis of a 20% subscription, that would require a much different order than the one FERC wrote. I'd like to amplify a bit my colleague's point that FERC here was not tasked with choosing between two comparable consultant studies. One was commissioned by the pipeline to support just a result, and the other was commissioned and adopted by the regulator that is charged with protecting the public and ensuring the reliability of the local gas system. On questions of gas distributor needs and resources, the board is the expert agency. Every year it receives and reviews filings by the New Jersey distributor. Council, FERC is also an expert agency. So what specific point in the New Jersey study are you saying that FERC did not engage with? FERC overestimated demand. FERC acknowledged that the Transco study overestimated demand by accepting demand forecasts that did not fully account for legally mandated gas use reductions that were slated to begin in 2025. If you look in the record at JA59 and JA298, what you'll see is that Transco extrapolated historic usage patterns and short-term forecasts through 2025, but that would not have captured required reductions that were slated to begin in 2025, 2026. So the demand was overstated. And on the supply side, you were asking earlier about this question of non-firm supply, short-term contracts. FERC itself acknowledges at page 32 of its brief and the FERC order, we're hearing order at note 79, acknowledges that distributors typically structure portfolios with both long-term and short-term supplies. And it's correct that New Jersey Natural Gas provided a schedule that showed reducing short-term contracts in the future, but we have no idea why. One possibility might be that they thought those contracts would become unavailable. They didn't say so. FERC didn't make that finding. Other possibilities are they didn't think that they would need that short-term contract, those short-term contracts in the future. I think FERC's fundamental point, and I appreciate that there's an argument that this risk is not adequately substantiated, but the fundamental point that they make is our job is to ensure reliability. And so what we can do, the fundamental difference is risk tolerance, and you are more tolerant of risk and we are going to eliminate these non-firm supply contracts that are subject to competition and we're doing long-term planning, and we as the agency responsible can take a more conservative approach. Why can we say that's unreasonable? I would dispute very strongly that FERC is more responsible or less risk tolerant than the New Jersey board, which is the regulator of these local gas companies, charged with ensuring reliability. If retail customers can't get gas, they're going to call the board. They're not going to call FERC. I think the bottom line of your argument is that we should credit the New Jersey board over FERC, and that's not really a call we're able to make. That's not quite what I'm saying, Your Honor. I think the fact that FERC was dealing with the result of a two-year state investigation, commissioning an independent study, holding a technical conference, receiving written reports on the draft study, including by the distributor companies, and then issuing a decision that no one appealed, I think that imposed on FERC an obligation to dig into the record more deeply than it did. And I would add, looping back to the climate change and harm issues, that the magnitude of those harms also imposed on FERC a greater duty to look deeper. FERC's own policy statement says that the greater the harm and the more interest adversely affected, the greater the evidence of need and benefit that will be required. And sure, if it were cost-free, more supply, more pipeline capacity, more resources are always better. They're always going to result in some incremental improvement to a liability. But FERC's job is to weigh how much of an improvement it's going to make against its costs. FERC fundamentally failed to do that here, and its decision should be vacated. Why isn't there a Clean Air Act argument raised with respect to the air quality standards? I do not know. I mean, that is, you know, the EPA is the one that's going to enforce that. FERC isn't an environmental enforcement agency, but it is obligated to take those environmental consequences into account. I would add that FERC itself found that these downstream emissions were reasonably foreseeable. There's no dispute about that. On the design day demand, you mentioned that, in your view, the certificate order is issued to account for four days of potentially inadequate capacity, and petitioners liken building the pipeline to buying a car to take care of having to go to the airport once or twice a year, and that would be an overly expensive purchase for those rare instances. But I guess it's unclear to me what the relationship is between peak demand days and the general demand curve. I mean, I've assumed that the peak demand days are not the only days in which there might be a problem, but that it sort of becomes a proxy because the general height of the curve has some relationship to the height of the peak demand days. Or is it really the case that FERC is just approving a massive investment for only a few days of shivering? I think it is basically the latter. I mean, FERC is very clear in its order that the design day is the basis for planning gas capacity. And remember, design day demands are already really conservative estimates, about 35% on average greater than even historical peak demands. So you already have a reliability buffer built in there, and what we see in FERC's order is just a layering on of reliability benefit, reliability buffer, one on top of the other. We're going to overestimate demand. We're going to assume that supplies on which the utilities historically have relied won't be there. Actually, they don't even make that assumption. They simply say it's possible. At some point, there's a limit, and you have to grapple with what are the costs of trying to achieve that level of reliability. And on the other side of the balance, the benefits to rate payers, is there any known model or are there cases in which FERC has actually done some kind of quantitative, even if rough or range-based, some kind of quantitative calculation of the value of the benefits? And is that something that any case that you're aware of dealing with certificate orders has required? I'm not aware of one, but FERC deals with these kinds of issues and manages to quantify them or provide ranges all the time. I think that certainly is the kind of evidence that FERC could consider. And as I mentioned, in this case, FERC didn't rest on any attempt to quantify, in any sense, even roughly, the magnitude of the benefits on which it was reliant. Again, we would urge the court to please vacate FERC's order. I'm sorry, did you have another question? I did have a question about the upstream harms and what those are, and just if you would sum up the concerns about FERC's treatment of them. Are you referring to the upstream greenhouse gas emissions? Candidly, Your Honor, that is not an issue that we've briefed. I think I would defer to my colleague to address that on rebuttal. Thank you very much. Good morning, Ms. Perry. You may proceed when you're ready. Good morning. I would like to start just in response to your question, about the interruptible demands. There were separate findings. There are numerous public benefits and need factors that the Commission looked at. Under the Certificate Policy Statement, meeting unserved demand, eliminating bottlenecks, access to new supplies, lower cost to consumers, competitive alternatives, reliability. And here the Commission found, A, that this was needed for reliability for the local distribution customers, which include the New Jersey local distribution companies and also one, PICO, in southeastern Pennsylvania. But the interruptible finding was a separate finding of benefit. In addition to the reliability benefit that this project would provide, the Commission found that it would also eliminate bottlenecks and pipeline constraints that made Transco unable to provide interruptible service to gas generators when there was peak demand because there wasn't any excess capacity left over. And that was a benefit and would also provide cost savings. And they also found that there was a benefit of supply diversity. But those are additional benefits. The reliability benefit, the design day demand that we have been talking about, is a separate issue from the interruptible. Can you unpack supply diversity for us more concretely and show us in the record where that's more concretely discussed? Because I have seen the packet that you're talking about that refers to the sort of I'd like to hear from you on where the more robust and concrete support is. Well, Your Honor, the Commission pointed out that this project would interconnect the Transco system and these shippers to three large gathering systems. That's a source of additional supply. I mean, they have access to all of the producers that are interconnected through all of those large gathering systems. And that's additional supply. And you can see that. I mean, this is discussed at paragraph 68 of the certificate order and also in paragraph 94 of the rehearing order. And so that is clearly supply diversity, access to producers that don't currently have access to you. And they are large gathering systems, three separate ones. So it's a fair amount of additional supply diversity. I had a question for the Foundation that I also would like to ask you, and I know that we do rely on precedent agreements to show market needs. But given that FERC's own standard is articulated in terms of new demand, new users, how does a precedent agreement with an existing LDC that has existing customers actually show that this is not going to be developed and paid for by existing rate payers? Well, the market needs showing in this case, Your Honor, has to do with the reliability requirements and with the other benefits that come from the project. This is not – I'm not aware of – in thinking back on the precedent agreement cases, I'm not aware of ones that have to do specifically with local distribution companies. But the Commission clearly found that there was a reliability need for this project in addition to the other benefits of the project, and that satisfies the Natural Gas Act's responsibility to find the project in the public need and convenience. And so it's less about price benefit and more about reliability? Exactly, Your Honor. I mean, the Commission's statutory responsibility includes assuring reliable supplies of natural gas, and that's exactly what they were looking at in this case, is making sure that there were reliable supplies of natural gas to these local distribution companies. And what's your explanation, just following up on the question that I asked Mr. Schwartz, about the design day as the indicator of the need for more capacity? Is that just building a pipeline to make sure that there aren't, you know, four really bad days? And I don't mean to understate the importance of having reliability on those days of peak demand, but do you have a different understanding than what Mr. Schwartz articulated about the role of the peak need days in the study and their relationship to the rest of the capacity curve? The design day planning is designed to make sure that local distribution companies can meet their statutory obligations to provide reliable service. And this is the standard by which local distribution companies and their capacity arrangements are judged. New Jersey judges them that way. That's why they make filings every year that has design day projections, that has their available capacity. They have to make sure that they meet this standard of reliability. And Pennsylvania requires it too. The states require it. The commission recognizes it. This is a recognized need of assuring sufficient reliability for parties who have a statutory obligation to provide reliable service. So is it akin to buying a car because you don't know whether you're going to be able to hail a cab on the four days a year that you have to go to the airport? And it's more important than that and, therefore, we're willing to buy the car? I don't think you can simplify it. Let me say first, for the record, nobody in this case has challenged the design day planning, that that is the appropriate standard to be used. And it's the standard that is used universally for making this judgment. Nobody has challenged design day planning. But design day planning is set up that way because you can't anticipate, particularly in this age of climate change and severe weather events, you can't anticipate what may be coming. And so you don't know how many days may be peak days, may be higher than historical peak days coming up. And so what you're doing is assuring, giving enough margin, as my colleague just said a few minutes ago, 35% over the historical peak is kind of the area that you're talking about. You're giving that margin to make sure that reliability will exist because this is heat to people's homes. And why not on this type of project not have the evidentiary hearing? Because you could, you know, challenge statistical models, challenge the studies, challenge what is the actual cost to the rate payers. This court has always said that the commission has discretion about whether or not to have an evidentiary hearing or to have a hearing on paper. But my question is why not? Well, the commission felt that having reviewed the studies, it had a sufficient understanding of what was being claimed. Are you trying to basically look at climate change? Well, Your Honor, the climate change doesn't have anything to do with the studies. And Petitioner's Council said they didn't even want an evidentiary hearing as to the climate change issues. So they were only asking for it as to the studies. But that's a different question. I'm not asking about climate change with respect to the evidentiary hearing. I'm asking about climate change insofar as the environmental impacts, just further quantifying that. Well, Your Honor, the commission quantified the environmental impacts in the manner that this court has affirmed on several occasions, most recently in the Center for Biological Diversity case. It calculated the emissions and it compared those emissions to state inventories and to state greenhouse gas emission goals. And this court has said Center for Biological Diversity, Appalachian Voices, the Sierra Club decision, and 867 F-3rd, there's so many of them. But 867 F-3rd is the one who said you can do it this way. You can analyze greenhouse gases this way. And so the commission did that. What this court has said is adequate. And the commission also calculated the social cost of carbon. But the commission found that it couldn't attach a significance label to the social cost of carbon, which has also been affirmed by this court, including in the Center for Biological Diversity. Significance aside, where would you point us in the orders to show that the commission actually considered all of this information, 11.8% more in New Jersey, et cetera, et cetera, about the seemingly large amount of greenhouse gas emissions here and found that the benefits of the project outweighed them under Section 7 of the Natural Gas Act? Well, Your Honor pointed earlier to the paragraph 81 of the certificate order where the commission said that considering all of the environmental discussion, that it found on balance that this was an environmentally accessible action. But how can we know whether the – there's two possibilities. The commission laid out the information, the social cost of carbon, and then said, as the D.C. Circuit has said, we don't have to put the significance label on it. And so we're forgetting about it versus this conclusory sentence at the end means we really thought about those emissions and find them outweighed. Well, the conclusory sentence at the end, Your Honor, is the conclusion of an enormous discussion of all kinds of impacts. I mean, to wildlife, to water, to air, to – the commission didn't list all of those in the conclusory statement, but that doesn't mean that the commission didn't consider them. They talked about them. So is it your position that the commission did include in its Section 7 balancing the greenhouse gas emissions? I thought those were set to the side. They were set to the side, Your Honor. What they don't do is assign a significance label to it, but they certainly consider it along with everything else that's in the environmental impact statement. That's the purpose of going through the analysis in the environmental impact statement. Like this court said in the Sierra Club decision citing to Wild Earth, the estimated level of the greenhouse gas emission is basically a reasonable proxy for climate change impacts. And the commission considered it by making the comparisons, making the calculations and making the comparisons that this court has said are acceptable and taking that into consideration. Except it's acceptable from a NEPA perspective. Exactly. Have we said something like that is acceptable under Section 3 or Section 7 of the Gas Act without any evidence that you actually consider? It says, for informational purposes to the public, here's how bad it's going to be. And then there's no other mention of these emissions. Well, the informational purposes to the public has more to do with the social cost of carbon calculation, I think. The commission makes the social cost of carbon calculation and says, we can't attach any significance to that. But that doesn't mean that the calculation of greenhouse gas emissions and the comparisons of those to the national and state inventories, the commission takes that into consideration. How much weight do you give to the state's own calculations or the state's conclusions and recommendations about its own legislation in trying to reduce gas emissions or the fact that it is saying we don't need this? How does the commission just override that, to me, very compelling statement by the state? Here basically is what the commission's final take on that was. If you look at Paragraph 70 of the rehearing order, what the commission said was they have a goal by 2050 to reduce their greenhouse gas emissions by 80%. We are looking at a situation now where there's a reliability need now for this project. There have been no alternatives proposed that would suffice to cover this reliability need right now. And our statutory responsibility is to assure reliable service. And so, therefore, in our public necessity and convenience calculation, we can't let the 2050 goal of the state override our assessment that there is an immediate need for reliability. And this project is the only alternative that has been offered to us that would solve that problem. And that was... Can I take you back to the studies and this reliability finding? Do you agree that the sort of key dispute, key difference between these studies is whether or not they take into account non-firm supply? That certainly seems to be the case from the orders and the sheer quantity of these non-firm, I'm not sure, off-peaking resources, that's the main difference. Is that correct? It's that, and it's also the demand projections. But as to the... That's basically interruptible demand? No, no, no, Your Honor. That's the local distribution companies for projecting design day demand of 1.02%. And in the base case for the New Jersey study, they were projecting design day demand, which means the LDC demand, of .80, .80% in their base case. But the off-system peaking, if you... This is a much bigger variable, right? It's 619,000 decatherms they assume will be available. This whole project is for 800,000. I think on the demand side, we're talking about fractions of a percent, right? So the focus should be on this supply side issue? Certainly, Your Honor. I would like to clear up, though, a factual issue, which seems to have been coming out wrong earlier in this argument, which is in the Transco study, they did not assume that all of that third-party peaking contracts would be unavailable. What they assumed was, and you can see this at Certificate Order, Paragraph 27, the Rehearing Order, Paragraphs 40 and 41, and actually Petitioner's Reply Brief at 13 notes this, too. The only thing they discounted was off-system peaking contracts that were with parties who did not have firm delivery in the region, which is New Jersey and southeastern Pennsylvania. Do you know what the magnitude of that is? Well, here's the thing. The magnitude, the ones who do have primary delivery points in that region, was 407 million decatherms. But you have to bear in mind, because everything is a little more complicated, that the Transco study, the region was not just New Jersey. It was also southeastern Pennsylvania where PECO is. And on the other hand, the New Jersey study was only New Jersey. So that 400 that the Transco study said would still be available is less than that for New Jersey. But there weren't numbers breaking out New Jersey separately. So I don't know. But there is still a bit, so I just wanted to make it clear that they're not saying all 619 is not going to be available. So let's say they're saying it's about 300, right, or something. I won't hold you to that. But the key, what I want to get your response to, is that the key explanation from FERC about why it's reasonable to assume these contracts will not be available is in paragraph 65 of the rehearing order, which essentially says these are short-term contracts and they're subject to competition. And so we'll assume that they won't be available. And I think the question they're asking is, shouldn't you have to at least point to some time anywhere where these have not been available in order to make that extremely conservative assumption? Well, a couple of things about that, Your Honor. One, the New Jersey study itself listed this as a caveat to its conclusion that there would be enough supply. At page 100 of the New Jersey study, they say a caveat is we're assuming the same volume of ALF system supplies are going to be available for the next 10 years. That's a caveat to their conclusion. Secondly, it's – now I've forgotten where I was going with secondly. Well, let me ask you a specific question. Something you said earlier. Oh, go ahead. You're asking for the basis, for the conclusion. The reason why the Transco study explains this, the reason why Transco excluded people who don't have primary points in the service area is that those are a scheduling risk. Because if the primary points are fully used by people who have primary access to those points, secondary point service, which is what you would have, if you were buying capacity from somebody who doesn't have primary points in the region, secondary point service doesn't get priority for scheduling. And so you can't, on a design day, when everything is at its peak, you can't count on that. Has there been a weather event where these types of resources with secondary delivery points are unavailable to LDCs in New Jersey? I don't know that. Neither do I. And I think the point is that, you know, if we can just say climate change is happening and weather is going to get bad, that's always going to justify approving any project. And why can't we insist on a little more detail about the basis for these projections from FERC? The point is that you need to be conservative about this assumption. And the commission was making conservative assumptions when you're talking about anything that is not firm, priority, primary point, reliable service. The commission said that for a design day, you can't count on interruptible service, you can't count on secondary service. You have to have primary service. So what's the evidence for that? I think my question was when have they not been able to count on secondary service and interruptible service? And I think it's undisputed that there's never been an instance where that's been the case. Maybe we still have to, I want to be clear, maybe we still have to defer to FERC's projections. But you agree there's no evidence this has ever happened. We've had bad weather before. I don't know. There was nothing in the record that had evidence of that. But I'm not sure anybody specifically looked into that. The New Jersey Council said we've been doing it this way, principally relying, almost exclusively relying on this kind of contract. We've been doing it for, I think they said 20 years. And, yes, I mean I think everybody also has assumptions and assertions that things are changing. But, you know, that's something on the other side of the ledger. Well, right, your Honor. But, again, the commission wasn't saying and TRANSCO wasn't saying that all of these are not available. It's only the ones with secondary points. And it's possible that, well, and you have to consider the fact, too, the New Jersey natural gas, the 200 million thousand decatherms, that they said they were not going to contract for after 2021, they were nevertheless counted in the New Jersey's calculation. And if you look at their scenario 1A, for example, which is where they used the LDCs on demand growth, their surplus was 163,000 decatherms in 2030. And the 200,000 decatherms that New Jersey natural gas is not taking would make the difference between that being a surplus and being a deficit. And simply we're arguing that they're not, maybe confusing different arguments, there's a lot of numbers in this case, but I hope they were saying they weren't taking it only because it hadn't gotten around to the cycle when they needed to contract for it. All of the other local distribution companies projected their third-party use. And the New Jersey agency, in calculating these figures, said we're using the local distribution company's own projections for their third-party contracts. They said that. That was the basis for the numbers that they used, except when it comes to New Jersey natural gas, and then we don't like their projections and we're not going to use them. You have mentioned several times the responsibility of the commission to ensure reliability. And it is also the commission's position that it is the entity responsible for weighing environmental costs. Is that correct? Exactly. That gets into the calculation of the benefits and harms of the project. And so when it's weighing the peak demand day and the capacity shortfall, is it part of the weighing when FERC concludes it may be cheaper to build more gas supply now than to rely on pricey peaking resources? If New Jersey and maybe Maryland and other states say, well, that's the point, it should be more expensive because we're in a process of trying to transition to less greenhouse gas emitting resources. Is that an argument that is in FERC's competence taken into account or not? And if not, whose responsibility is it? Well, I think the commission could take it into account, but the commission found in this case that that was not an alternative to the project, that it wouldn't meet the reliability need, the off-system peaking contracts, and say, therefore, they didn't consider that because it wouldn't meet the reliability. Didn't consider what? Well, they wouldn't consider that as an alternative, in essence, to the project. Didn't consider what as an alternative? The off-system peaking contracts, that they could get off-system peaking contracts that would cover the deficit in reliability. So their assumption is not that they would be more expensive, but that they just would be actually unavailable. That there wouldn't be enough available to cover the deficit in the local distribution company's capacity that was needed for reliability. The commission's conclusion was that basically starting right away, there needed to be capacity because there was no other alternative that would meet that need, and that includes the off-system peaking resources. Can I ask a question about – there's a lot of issues in this case, but one of them is on the refusal to make a significance determination under NEPA specifically for greenhouse gases, and my question is about Northern Natural. So the petitioners raised that case, which has – it's very specific, but has some very broad language that says, we find there is nothing about GHG emissions or the resulting contribution to climate change that prevents us from making that same type of significance determination. And I think the rehearing order on 854 and 55 acknowledges that argument and then doesn't respond. Why isn't that – it's a seemingly on-point authority. We've reached the opposite outcome here. Why isn't that arbitrary and capricious, and why shouldn't we remand for an explanation about what was different between Northern Natural in this case? Well, Your Honor, Northern Natural specifically says in paragraph 33, it references the commission's ongoing proceeding to figure out how to deal with the significance issue in greenhouse gas emissions, and specifically says, However, the commission's approach to significance evolves. This case is not significant. Where does it say that? In paragraph 33. Of? Of Northern Natural. Sorry. I thought you were characterizing something in this case. Oh, no. Sorry, Your Honor. It's Northern Natural, and then they go on to talk about the tiny, tiny greenhouse gas emissions from that case. Right. And so I would say Northern Natural was an oddity in commission's precedent, and it was specifically saying whatever standard we ultimately decide on for significance, this is not a significant case. So why isn't 50% of New Jersey's future greenhouse gas targets, whatever definition you choose, significant? It seems like the opposite might be true here, and there's no explanation of why that's not the case. The commission found that it couldn't attach significance to the state's greenhouse gas emission targets, and this is in the EIS at 4-175, and it's also discussed at the rehearing order, paragraph 107, that it couldn't translate that into a significant determination. But ultimately, again, it goes back to the commission's point that a 2050 greenhouse gas emission target doesn't change the fact that it is looking now at a situation where there is not adequate capacity for reliability, and there are no alternatives proposed that respond to that. Absolutely matters for Section 7, but under NEPA, I guess I'm still wondering why there wasn't a requirement for the commission to explain. In Northern Natural, this case that has been specifically raised to us, all we said there was that it was so insignificant and you can't do the inverse and assign a significance label for X, Y, Z reasons. That's just not in the order. What is the order is the commission's explanation for how it cannot assign significance, and this court has affirmed the commission issuing orders that do not assign significance to greenhouse gas emissions. Have we done that for orders issued since Northern Natural yet? I'm not sure we have. Center for Biological Diversity, I think, may have been post-Northern Natural. I'm not sure about that, but I think it might have been. Your Honor, would you like me to address the upstream? Yeah, I just have a question about the design day, what goes into determining the design day, and does interruptible demand figure into the commission's concerns about inadequate capacity? Oh, no, absolutely not. That was a completely separate benefit to the project of serving interruptible gas generators who were getting curtailed under current circumstances. That had nothing to do with design day. Design day is all about whether the local distribution company's own capacity is sufficient to meet the design day projections, and that's why they make filings with the state every year that have those demands and projections and their available capacity projections. At one point, the commission refers to LDC planning practices nationwide, and I'm looking at paragraph 41, that the Transco study was based on traditional LDC supply planning practices, and it says those practices were developed under the supervision of state regulators nationwide, and it just struck me that the deference to a kind of a norm of all states is used in some sense to trump the actual planning by the states involved in this case, principally New Jersey but also Maryland, and I wondered if you had any comment on why that would be the more reasonable assumption to use. I don't think it's that, Your Honor. New Jersey employs the same design day planning standards that everybody else does. I mean, that wasn't meant to distinguish what they're doing, and as a matter of fact, the New Jersey study was presented, but they didn't even oppose the project, and the New Jersey study had nothing to do with the project. It was done before the project was proposed, and the project was not at issue there, but their design day standard is not any different than anyone else's. Yeah, I'm just looking at this one paragraph, and it says despite the shortcomings in the Transco study, it was generally consistent with accepted traditional LDC supply planning practices. So this is about supply planning, and the commission determined that Transco factored in competing demand for natural gas from electric generators, but I thought you had just answered my question and said that the demand day doesn't consider demand for natural gas, but this is saying that it more accurately reflects overall future demand. To factor that in, rather than focusing only on LDC, so this is a difference between the studies and the demand day figure. Is that what I'm missing? It was a separate sentence for a separate benefit from the project, and a benefit of the Transco study, which it evaluated that separate benefit of the project, which the New Jersey study only concerned design day and didn't concern interruptible service, but that wasn't meant to say that the interruptible service has anything to do with design day planning. You don't plan capacity around interruptible customers, but it is a benefit to the project, and recognized by the certificate policy statement to serve additional demand and to provide better and more reliable service to other sectors of demand who aren't the local distribution company customers. And who weren't the precedent agreements that Transco submitted to support the project. That's right, Your Honor. I mean, these interruptible customers are taking from people who have firm contracts. The customers who contracted for the project capacity are firm customers. Did you want me to address upstream? Yes, please. Essentially what the commission found with respect to the upstream emissions was there was a two-fold reason why the upstream emissions were not properly considered. And it's environmental analysis. Both reasons are based on this court's precedent in the Delaware Riverkeeper case, and particularly in this court's Burkhead decision. On the first instance, they said there is no causal relationship between this transportation project and there being more production of natural gas. Because the record didn't show that the project will spur any additional production, and this is re-hearing of paragraph 97. And in Burkhead, there, in Burkhead, there was one producer who themselves contracted for all of the project capacity. And the court still said there was no causal relationship between them contracting for transportation capacity and there being additional production because there was no evidence they couldn't get their production to the market in some other way. There was no evidence. They had failed to raise the issue. But they also, the panel there also said they suspected that that information could be provided. In that case, they said, well, they said because there was no evidence that the producer couldn't get the gas to the market without the project, there was no causal relationship. With respect to the additional information, they said because there was one producer, one producer who was actually contracting for the capacity, they said you could ask that producer. And in this case, and this also goes to the next point, which is it's not reasonably foreseeable, the additional production is not reasonably foreseeable. So the commission found in this case, unlike in Burkhead in that situation, there are the shippers can contract, they're interconnecting with three large gathering systems, all of whom have producers connected to them. The shippers arrange for their own supply. They can contract with any of those producers. They can change the producers that they contract with. And the producers who are interconnected to those three large gathering systems can change people's needs. So this is the thing that I found puzzling, and it's not my area of expertise the way it is yours, that the orders talked about we don't know where in the Marcellus Shale, big, different states, we don't know where this is going to come from. And then we don't know whether new wells will need to be drilled. But I found myself wondering, there is going to be more extraction, presumably. That's the whole point of added capacity. Am I wrong about that? But, Your Honor, this is transportation. And what the commission says in their dominion order that they cite in their order, it's a separate step in the supply chain. And so the producers decide how much to produce based on the price of gas and who's buying it and what's the cost of drilling these days, not because there's additional transportation available. And if you think about it, a couple of weeks ago there was an article in the Wall Street Journal that said that the price of natural gas is dropping because there's a glut of supply. And it doesn't have anything to do with whether there's transportation or not. There was nobody to buy the gas and so the storage fields were full. But the fact that you're building additional transportation is not necessarily causally related to there being more or less production. It's just another way to get the production to purchasers. It's the presence of demand that drives the production. If there's nothing further, thank you. May it please the Court. My name is Elizabeth Whitmer with Saul Ewing. I represent Transcontinental Gas Pipeline, LLC, commonly called Transco. I wanted to talk a little bit about the status of the project because nobody has talked about that yet. So the REIA project is intended to provide 829,000, give or take, decatherms of firm transportation to New Jersey and to Maryland and to Pennsylvania and a little bit into Delaware if you look at the chart. Currently, the pipeline segments of the project are built and the commission granted on October 20, 2023, authorization to begin interim service of $450,000 decatherms a day project capacity. That interim service is a separate offering of service. Four of the original shippers signed on for interim service and then there was a short open season in which new shippers signed on. So a portion of the line is built and operating and has been for about the past five months. Once the project is put into full service, which should happen sometime this summer, there are eight shippers with the delivery points in New Jersey, Maryland, Pennsylvania primarily. As we noted, more than 50% of the capacity is going to New Jersey LDCs. They're the ones who requested the capacity. And to step back a little and talk about capacity planning in LDCs, if you look at the order, at the studies, at the New Jersey rate council brief, prior to REIA, 90% of the firm capacity to New Jersey was held by LDCs. LDCs have an obligation to provide service to their customers. They are the last resort supplier. And like my co-counsel, I don't know that they have ever not been able in a public way to get that supply. It doesn't make any sense that they would make this investment unless they came very close. They are conservative by nature because they are required by New Jersey statutes and really by the statutes relating to public utilities in every state to provide this reliable service. What has happened in this discussion today, it seems to me, is it has devolved into the question in front of FERC and the question raised is should we have gone with a no-build alternative? But that wasn't challenged in this proceeding. We're talking about the balancing effect. Wait, when you say it wasn't challenged, they did argue that you should have... I mean, I thought that was the whole import of their argument, that the certificate was granted over a no-build alternative based on a slew of errors. That's not your understanding? It's not my understanding that they challenged directly the no-build alternative. Instead, they challenged the cost of greenhouse gas and the benefits provided that were done as part of the certificate analysis by FERC. I noticed that you, and I wondered if you agree with the commission. When I read your brief, I thought that your understanding of what the commission had done was that it had set aside the greenhouse gas indirect impacts, in part because the balancing of the interest is an economic test and that the public interest, as you characterize it, is a charge to promote orderly production of plentiful supplies of electric energy and natural gas. And you didn't talk about the extent to which it is the commission's obligation to consider how increased resource extraction bears on the public interest. In fact, you disclaimed that. Well, that had been discussed by FERC, and we are not allowed to repeat the arguments that FERC makes in our brief. Your position is that the greenhouse gas costs have been taken into account, but that the benefits outweigh. That's correct. We also did address the significance. It was not adopted by FERC, but it's in our study. We've been throwing around a lot of percentages and numbers, and we're all lawyers. I have trouble doing that stuff in my head. But there's an extensive analysis of the percentages in the TRANSCO study, and in fact, depending on how you look at it, the percentages are much closer to northern natural insignificance, the sneeze on the wind, than they are to an overwhelming impact on New Jersey. When we're talking about that 50 percent impact, that's when you take full burn as if it was a design day every single day, 365 days a year, seven days a week, and you extend it out to 2050. Do you know what the estimated annual metric tons of carbon dioxide equivalent is? There is a table in the study. It is table 4.8, and there is extensive discussion. Do you know what the number is? Let me find the table. So it's on page JA173 of the TRANSCO study. REIA CO2e emissions is a percentage of PA New Jersey and Maryland 2030 emissions targets. The New Jersey percentage is 0.011 percent. Maryland is 0.0002 percent for construction. Those are the construction figures, not operation, right? Construction operation is 0.007 percent for New Jersey, 0.002 percent for Maryland, and indirect, which is, again, the full downstream burn, 0.039 percent. And when you say not every day is a design day, I thought the effect of building the pipeline is that it is needed and therefore justified based on the design day figures that are talking about firm supply to LDC repairs. Is that right? Yes, in the sense that an LDC is obligated whenever that design day hits to be ready, and we don't know when it's going to be. But is it not the case that once the pipeline is built, surely TRANSCO then is selling the capacity to anybody else that needs it? So the decision whether it's justified is based, as you say, on this conservative estimation by LDCs and by the commission looking at their obligations to meet those critical needs. But there's capacity then in place, and that's being used for all kinds of different things. Like I believe Ms. Perry was saying, it's one of the benefits is that you can sell natural gas to electricity-generating plants and anybody else in the industry, anybody else who wants to use it, people who want to store it up for a rainy day. Well, again, to step back, so this adds pipeline capacity into New Jersey with diverse supply because it's coming from the Marcellus Shale, which historically is the lowest-cost gas in the United States. So the LDCs who are serving customers now have access to diverse supply that wouldn't have had before. We don't know exactly which producers, but in the application you can see there are at least three interconnects in the Marcellus Shale area, which were preexisting, which is where all of the producers from the 1,000, 2,000 acres of the Marcellus Shale, not all, are funneling, right? So if a transco isn't selling the extra capacity, transco is building the pipeline because enough people have signed on for firm reservation for 895,000 deck of therms a day. In this case, because it's 100% subscribed, not all pipelines are. So every day is a design day in that sense. If it's 100% subscribed, that means it will have the benefit, the key benefit for purposes of the certificate order, of meeting a need for ratepayers to keep their homes a few times a year, but the rest of the time it's being used, right? It depends. It's not always being used to 100%. It's available. The U-Haul is a U-Haul truck that sometimes only has full, even though you paid the full rate. I thought you just gave a figure that said there are contracts for it to be full. No, there are contracts, firm contracts for the capacity, but we don't sell gas. No, no, I understand that. And so we're not saying it's... So the LDCs sell gas, are using it. Well, now they're using it half, but when it's up and running, they'll be using it fully. Most pipelines are not full of their 100% capacity of gas every day. So the marketers may use it more than the LDCs. But somebody will be using it. Not necessarily. It's available, but it's not full of gas every day. So what's 100% subscribed is LDCs have paid for the right at any time to call on a specific amount of gas. That does not mean that every day that gas is flowing through the pipeline. Right, and they didn't pay for the right to call on a specific amount of gas. They are calling on a specific amount of transportation of gas. They have to buy the gas, so they're in a market where they're negotiating for the gas, and on days when they need it, they have the ability to use the pipe to get it to where they need it to be, which in this case are receipt points in New Jersey. And so the pipeline is not going to be at 100% full of gas every day, but the capacity is available. The other thing about this case and the fact that it is LDCs is that the LDCs were actively involved in this proceeding. As you noted, they filed comments themselves saying, we really feel that we need this to fulfill our responsibilities. But they also were active in the proceeding to hear New Jersey Division of Rate Council say, we don't think you do. They have choices, right? They had a proceeding agreement, and the order allowed the project only to go forward if they signed a firm service agreement. They've all done that. So despite the fact that they know that their state regulator, who regulates their rates, what they can recover, what they can supply, has indicated, I would call it the promise of stringent review, they have hung in there. And that, as FERC noted in the order several times, is compelling evidence of need. It is the LDCs who know more than third-party econometrics experts that we can all hire, you know, what they really need. They know that at their base, their obligation is to provide that service. They have another obligation under New Jersey law, which relates to the clean energy law. But if you read the details of what is in the New Jersey Division of Rate Council brief, so they're required to propose programs. Those programs have to be approved by the board, by the Board of Public Utilities. So yes, there is an overall goal for reduction, but everyone in this case agrees demand is going up. So the question becomes, how do you serve that demand? And who's best positioned to determine how to do that? FERC looked at all of these factors and said, we're going to go with the LDCs. They know, and they have demonstrated that they have a need in multiple ways, with studies, with comments, and with being willing to put their money where their mouth is. It is not a rational market decision to buy this capacity on the hope that someday, perhaps, you could game the market, which is the argument that petitioners make. But you know what, that discounts that those public utilities are, in fact, regulated at the state level. The VPU is here. They're not going to let them get away with playing games like that. So that's not really a rational argument. It's a red herring. I would say, finally, no one has talked about this test. In environmental defense funds, there is a test to set aside the certificate order, and it would be that an agency has relied on factors which Congress has not intended it to consider. Clearly not the case here. We have a huge EIS. We have both an order and a rehearing order, which go through all of the factors of the certificate policy statement. You would have to find that the agency entirely failed to consider an important aspect of the problem. I would argue that that also clearly not the case here. I understand there is dispute over how FERC should have considered greenhouse gases, but the truth is that what FERC did here is completely consistent with all of your cases. And Judge Garcia, by the way, Center for Biological Diversity was decided after more than natural gas. And the last would be that the agency offered an explanation for the decision that runs counter to the evidence before the agency, where it's so implausible it could not be inscribed. That's clearly not this case either. So petitioners can't make their burden of proof to set aside this order. The commission found that the project is required by the public convenience and necessity and will provide reliability and supply diversity. Those are only two of the things that they can look at under the certificate policy statement. They also looked at others, but those are the two on which FERC relies. They also found FERC made a specific finding that TRANSCO's explanation of increased reliability and supply diversity was corroborated by the TRANSCO study and, quote, And NJCS has offered no evidentiary basis that would call those findings into question. I know it's been a long day, so absent any other questions, which I'm happy to answer, I'll step down. Thank you. Welcome back, Ms. Naismith. Thank you, Your Honor. If I may, I'm going to try to run through several of the, I think, points that have been made. First of all, the standard that this panel is using to evaluate FERC's decision here, the APA requires that FERC's decision be predicated on a rational decision-making that connects the facts to its decision here, and I think we've described in great detail why we think that's absent here. And, moreover, we've also described multiple instances where FERC ignored a very, very important aspect of the problem. On the design day question that Judge Pillard, you were asking about earlier, I do want to take a step back and say that, yes, we all agree that design day planning is how LDCs go about this, but there's an important separate pieces of that design day planning, which that's an overall approach. That's an approach that says be cautious, build in a buffer. But the question of what is the actual supply number needed to meet that, that is that design day demand, and then also how do you meet that are not necessarily baked into any concept of design day planning, other than to ensure reliability. Going to your point, Judge Garcia, though, the reliability also has to be balanced with the cost of obtaining that reliability. This cannot be a reliability at any and all cost, and FERC never found that the off-system peaking contracts that we've been discussing here today were unavailable. They simply said it was uncertain whether or not that would happen. Just flagging that New Jersey Natural Gas had this unexplained departure from past practice that is wholly unexplained and a true departure from everything it has done up until this point in time. And we have to remind ourselves here that one of FERC's key goals and key responsibilities is to not only ensure reliability but to protect the rate payer. And so to the extent that reliability here is being brandished around as sort of an end-all, be-all, that's just not accurate in terms of FERC's own responsibilities under the statute. In terms of the point that these LDCs are doubling down and so that should be probative evidence that these are truly needed, the precedent agreements are binding. They don't get out of them unless there's no project, and maybe not even then. We don't know. We've not seen them. But the fact that they're doubling down does not actually add anything to that story. I would also just say in terms of demand, and the question, a really key point of this, we've talked a lot about how much supply is available, but the other part of the dispute and the discrepancy between what FERC and TRANSCO are arguing and what New Jersey found is how much actual demand, how much is that demand truly going up. And one of the key flaws in the TRANSCO study was that it was taking those LDC numbers at face value and not accounting for the fact that those LDC numbers do not take New Jersey energy efficiency requirements into consideration, and FERC's own rehearing order dismisses that to say, well, we don't know how those are going to be put into effect. That's true for the greenhouse gas reduction goals and mandates because that does require a much longer planning process, which New Jersey is already well on its way towards achieving. But the energy efficiency reduction numbers that are the problem with respect to why TRANSCO's numbers are too high are not anything the state has to do more other than enforce. It is up to the LDCs themselves to figure out how to get there. And so FERC is really misunderstanding the nature of that argument by saying, well, we don't know what their plan is and the state has to do more. No, it doesn't, not for the energy efficiency matter. So you're saying there are energy efficiency measures that are required? Yes, currently. As of 2025, the LDCs are statutorily required to reduce their consumption levels by 0.75 percent per year. So there was no incentive, there's no enforcement? There is enforcement. They're subject to penalties if they don't do it. And do you have a site in your brief for that or somewhere we should look for that? I believe, Your Honor, that yes, that was cited to you in our brief, but I can pull that out of New Jersey Statute Section 48, colon 3-87.9. And we do cite to that in our brief as well, Your Honor. I just don't have that page right in front of me. Moving along to the benefits side of the discussion. So that authorizes the Board to make orders, but does that just mean make orders in individual cases or to make a policy order? I'm not sure, Your Honor. I'm sorry. I may have given you the wrong statute. I know we absolutely cited to it in our brief, the specific provision that does require at a minimum 0.75 percent, and the Board could have gone higher but didn't. So the 0.75 is absolutely statutorily required, and I apologize. I just don't have that site in front of me standing up. And it's 0.75 percent what? Percent of annual consumption, just a decrease in annual consumption levels. Of natural gas? Yes. Okay. It looks like page 49 of the petition is brief. Thank you, Your Honor. Moving, unless there are other questions on the supply side, in terms of the discussion that was had on the other benefits that might result from this project, on the interruptible service point, that is potentially a benefit that could result from more supply. But, again, given the fact that all of these contracts are with LDCs, we have to ask ourselves and FERC needs to ask, well, maybe there will be interruptible service customers who will get additional gas, but that, again, still is going through those captive rate payers. There's no evidence in the record that the LDCs themselves have any kind of contract, and by interruptible service by its very nature, is not subject to a contract. So the firm customers that the LDCs are both captive and being served allegedly by the need here are not interruptible customers. So that might be a side benefit, but we have to ask ourselves, who's paying for that? And, again, that's one of FERC's responsibilities, is to make sure that captive rate payers aren't left holding the costs, the bill, for providing some benefit to a wholly different class of customers. On the supply diversity side, and there's also a question about the fact that this project is pulling effectively from the same area of the Marcellus Shale, which, as we discussed in our reply brief, is a problem because the problems FERC has identified in its own studies, such as Winter Storm Elliot, for example, that happen in these extreme weather events is actually problems at the wellhead, not problems in terms of the transmission. So because this project is just drawing effectively, it's more transmission capacity, but it's drawing roughly from the same area that Transco's already drawing from, that alleged supply diversity benefit also just isn't substantiated in the record. It's one of these things that FERC throws out without a whole lot of backing up. What's your response to the notion that upstream effects are incalculable because they're not caused by this capacity and we don't know where they are, we don't know whether there's any additional well drilling? Your Honor, we, in our various rehearing requests, as well as in our briefs, discussed why that's just not accurate, that you don't need to know exactly where every single solitary well is going to be with precision to look at specifically upstream greenhouse gas emissions. The EPA provided FERC in its comments on the draft EIS with estimates that are more generic in nature that are doable for purposes of looking at greenhouse gas emissions, and FERC's response to that was essentially just to say, well, EPA's numbers doesn't change anything. They don't explain why they don't change anything. I heard Ms. Perry to be saying there just isn't any direct causal relationship between the availability of transmission capacity and the extraction of natural gas, that it may be extracted and stored, it may be... I mean, I guess that's the implication, that you can't kind of... And I think actually we have a case in Delaware where we said, you can't just say because there's more pipeline capacity that there will necessarily be more extraction. We responded to that, Your Honor, in pointing out a variety of different tools, and while that might be true in the short term, it really doesn't hold up over the duration of a project that's going to last 15 to 17 years. There will need to be more wells. Those wells don't last that long. They don't. So to keep this additional capacity full, or at least subscribe, they're going to have to drill more wells. Not to mention, Your Honor, there's sort of an oddity here of saying, well, we don't really know if this is ever going to be used. There's a tension between the argument that is saying, well, this is not going to produce any additional production upstream, and yet we need all of this capacity in order to satisfy real consumer needs. If no additional capacity is really needed, and therefore no wells will be drilled, there's a bit of a disconnect between those two arguments. And I was just moving on, unless there are more questions on that upstream point, Your Honor, but I think the distinction really is in the record between some of the other cases that this Court has seen previously on upstream is the evidence that EPA and others put in front of FERC to say, you can do this calculation with respect to greenhouse gases. You don't need the level of specificity that you seem to be demanding. And FERC, again, never addressed those arguments head on. They just dismissed them in a short one-sentence line. I don't think I've asked or anybody else has asked today about the ozone precursor issue. Yes, Your Honor. So the ozone precursor issue is, again, a similar issue of there are modeling tools available. Yes, there is some uncertainty, but the downstream area here is out of attainment for ozone. And so FERC doesn't even try to make use of the modeling that petitioners identified. And EPA flagged this as well as a real concern of downstream areas that already are suffering poor air quality. You're talking about putting a whole lot more gas usage into those areas. NEPA provides for dealing with some of the uncertainties that necessarily occur by just modeling ozone. There are ways around it. EPA recommended that FERC should do it. And FERC's summary dismissal and refusal to even try is not consistent with NEPA or its obligations under the Natural Gas Act to consider the full extent of the harms as balancing projects' harms and benefits. I just also wanted to respond to the allegation that we didn't challenge the no-build alternative. I'm not quite sure exactly what counsel was getting at there, but we certainly did across a multitude of different arguments, including one we also haven't talked about here today, which is the fact that the project's purpose and need was defined far too narrowly, and as a result, the no-action alternative was rejected because it didn't involve transporting 829,400 decatherms of gas. So I think that argument is more than preserved. How should the project's purpose have been defined? The purpose should have been defined, Your Honor, with respect to the broader goals of this project. To the extent that this project is seeking to ensure reliable energy provision to this particular part of the country, that is the type of statement of purpose and need that should be used here. It should not be down to the last decatherm exactly what the applicant is seeking, nor should it be an assumption that the transportation of gas is the only way to meet those goals. There's a little bit of a conceptual and institutional problem. FERC is looking at a particular application for a certificate of convenience and necessity. It's not a national energy use policymaker. So when you say the goals of the project should be reliable energy provision, or should it be, is this gas need? I mean, you framed it in your papers, but I have some both intuitively, I appreciate your point, but I'm also not sure that FERC is in a position to do as big picture of an analysis as you seek. I don't think that the analysis, Your Honor, needs to transform FERC into an energy planning entity, but this project is serving not the goal of, in and of itself, let's transport 829,400 decatherms. The benefits to all of the discussion we've had today go at serving particular customer design day needs, serving the need to make sure that these customers have sufficient amounts of gas to keep their homes heated. So to define the project in the terms of it has to transport this amount of gas and divorce it entirely from the question of is that needed? Does that serve the true public need is not consistent with NEPA and is not consistent with the CEQ's own regulations that came out recently, which FERC interprets as saying, well, sure, we can consider the applicant's purpose. Yes, but not down to the last, not just swallowing the applicant's definition of project purpose so narrowly that it meant, again, a summary rejection of the no action alternative, as well as a very reasonable alternative here would have been to say maybe we should downsize this. Maybe we don't need all 829,400 decatherms. Did you propose that? We raised the question of the fact that there were not adequate alternatives in our hearing requests in various places, Your Honor. But propose that as an alternative? I would have to go back and double check, Your Honor. I think we had some mentions of that in our hearing request. I don't know that it was an affirmative proposal in the way you're contemplating, in part because members of the public are not in a position to say, hey, we know it should be 500,000 decatherms instead of 829,400 decatherms. We did indeed raise the fact that there needed to be alternatives other than the very narrow ones that were considered here, and that was that we provided more detail about that in our rehearing request. I know I am way over time. I just wanted to quickly say the CBD case was indeed decided after the Northern Natural Gas case, but that case was focused very specifically on the use of the social cost of carbon, and it was focused very specifically on FERC's justification for not using the social cost of carbon. Three reasons that FERC did not use in this case in terms of its trepidation of employing the social cost of carbon, but nevertheless doing so. So that case is not dispositive in terms of the questions that, Judge Garcia, you were asking about FERC's done this before. How come they can't do it here? I would also just flag that in terms of an evidentiary hearing, to the extent on the environmental side, we have not necessarily asked for that, but to the extent FERC is justifying its failure to, for example, grapple with how a project with this much greenhouse gas emissions would thwart New Jersey's ability to meet its greenhouse gas reduction mandates, that's the kind of thing FERC could have had an evidentiary hearing about, to have a more informed discussion of what does this mean for New Jersey. Simply saying, well, we don't know and we can't tell is not a valid place for this entity to stop. And the other point as well is the chart that was referenced by Trans-Coast Council. Those numbers assume that gas is going to be replacing coal and oil fire generation, which the state of New Jersey is heading in a completely different direction. So adding in gas capacity is potentially also getting in the way of renewables, which is where New Jersey is heading, and that chart did not reflect the extent to which gas capacity would actually contribute. I think we're out of time, but we appreciate all counsel's presentations, and the case is now submitted. Thank you.
judges: Pillard, Childs, Garcia